E-FILED
Tuesday, 23 February, 2016  05:38:59 PM
Clerk, U.S. District Court, ILCD

IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS
SPRINGFIELD DIVISION

| | | |
|---|---|---|
| TERRIE L. FRYREAR, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 14-cv-3083 |
| | ) | |
| CAROLYN COLVIN, | ) | |
| Acting Commissioner of | ) | |
| Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

## OPINION

**SUE E. MYERSCOUGH, U.S. District Judge:**

Plaintiff Terrie L. Fryrear appeals from the denial of her application for Social Security Disability Insurance Benefits (DIB) and Supplemental Security Income Disability benefits (SSI) under Titles II and XVI of the Social Security Act.  42 U.S.C. §§ 416(i), 423 1381a, and 1382c.  This appeal is brought pursuant to 42 U.S.C. §§ 405(g) and 1383(c).  Fryrear has filed a Brief in Support of Motion for Summary Judgment (d/e 10), and Defendant Commissioner of Social Security has filed a Motion for Summary Affirmance (d/e 15).  For the reasons set forth below, the Decision

of the Commissioner is REVERSED and REMANDED for further proceedings.

## I. STATEMENT OF FACTS

Fryrear was born on March 17, 1984, and is a high-school graduate.  She previously worked as a shipping clerk and as an aide for older and disabled persons.  She last worked in January 2005.  Answer to Complaint (d/e 9), attached Certified Transcript of Proceedings before the Social Security Administration (R.), 36, 38, 59.  Fryrear suffers from status post Chiari malformation; residual dementia; history of Raynaud's disease; and bilateral carpal tunnel syndrome.  She also suffers from a sleep disorder which causes excessive sleepiness.  R. 14-15, 17-18.  She protectively filed her DIB application on June 22, 2010, and she protectively filed her SSI application on June 29, 2010.  She alleged her disability began on May 1, 2005.  The last date that she was insured for DIB was on June 30, 2005.  R. 12, 18.

On February 8, 2005, Fryrear saw her primary care physician, Dr. Donna L. White, M.D.  Fryrear complained of numbness and tingling in her right upper extremity.  Fryrear reported her right hand periodically felt tingling and went numb or asleep.  On

examination, Fryrear's right shoulder was stable, with full range of motion, and no tenderness found.  Fryrear had sensation to soft touch in both upper extremities, but Fryrear reported a difference in right and left.  R. 371.

On March 8, 2005, Fryrear saw Dr. White.  Fryrear reported numbness in both upper extremities.  On examination, Fryrear had mild decreased sensation to soft touch.  Her grip strength was equal, and Phalen's and Tinel's signs were negative.  Dr. White planned to refer Fryrear for nerve conduction studies.  R. 370.  On March 15, 2005, Fryrear saw Dr. White.  Dr. White determined that Fryrear was seven weeks pregnant.  R. 369.

On April 19, 2005, Fryrear saw a surgeon, Dr. George E. Crickard, M.D. III, regarding the numbness in her hands.  Dr. Crickard's notes stated that recent nerve conduction and EMG tests showed "bilateral moderately severe median neuropathies with compression at the carpal tunnels."  R. 286.  Fryrear reported numbness and tingling in both hands and arms.  Fryrear reported that she had "dead hands" in the mornings.  She could not open jars.  She reported radiating pain in her left elbow also.  She reported that it was worse sleeping on her side.  Dr. Crickard

recommended bilateral carpal tunnel release surgery after she completed the pregnancy.  Dr. Crickard gave her splints to wear at night.  R. 286.

On June 7, 2005, Fryrear saw Dr. White.  Fryrear reported continued severe carpal tunnel syndrome symptoms of pain and weakness.  Fryrear decided that she did not want to undergo injections, but she would try physical therapy.  Dr. White referred Fryrear for physical therapy for her carpal tunnel syndrome.  R. 366.

On July 1, 2005, Fryrear saw Dr. White.  Fryrear reported that she was continuing with physical therapy for her carpal tunnel syndrome.  Fryrear reported that she "still has a little bit of a problem but in general has improved."  R. 365.

On July 28, 2005, Fryrear saw Dr. White.  Dr. White noted that Fryrear was continuing to get "physical therapy for her carpal tunnel which seems to be stable."  R. 364.

On November 18, 2005, Fryrear saw Dr. White.  Fryrear delivered her baby within thirty days prior to this appointment.[1]

---

[1] Her previous appointment on October 18, 2005, was a prenatal examination. R. 356.

Fryrear reported that her carpal tunnel symptoms were worsening. She reported that she could hardly hold her baby. Dr. White assessed bilateral carpal tunnel syndrome, left greater than right. Dr. White planned to contact Dr. Crickard to schedule surgery. R. 355.

On December 15, 2005, Fryrear saw Dr. White. Fryrear had recently undergone gallbladder surgery on December 6, 2005.[2] The gallbladder surgery delayed the carpal tunnel surgery. Dr. White found that Fryrear had diminished grip strength. Fryrear reported that her hands were "continually numb especially the left." R. 354.

On March 3, 2006, Dr. Crickard performed a right carpal tunnel release surgery on Fryrear. The surgery is reflected in later records containing a list of Fryrear's surgeries. R. 589. The parties and the ALJ do not cite to any records of this surgery or the results, and the Court has not found any such medical records in the Social Security Transcript of Proceedings.

On December 20, 2006, Dr. White ordered an ANA Evaluation Screen test. The test was positive at 1:80/titer. The interpretive note stated:

---

[2] See R. 583, 589 for history of Fryrear's surgeries as of July 5, 2012.

Speckled ..... This titer may be clinically insignificant.  It may reflect non-specific ANA positivity seen with malignancy, drug therapy, and advancing age.  This pattern is most frequently seen in scleroderma, mixed connective tissue disease, systemic lupus erythematosus, rheumatoid arthritis, and discoid lupus.  Anti-DNA and anti-ENA may be useful if clinically indicated.

R. 303.

On March 29, 2007, Fryrear underwent a multiple sleep

latency test.  The test results report concluded:

This study, therefore, does document a tendency for hypersomnolence with rapid onset of sleep of around 2 minutes and 30 seconds.  However, no REM onset of sleep was detected.

This is compatible with a tendency for hypersomnolence/hypersomnia and is not incompatible with narcolepsy.  Other tests could be performed to try to shore up the possibility of narcolepsy.

R. 306.

On May 11, 2007, Dr. White ordered another ANA Evaluation

Screen test.  The test was negative.  R. 307.

On January 1, 2009, Fryrear underwent a CT scan of her

chest with contrast.  The results were unremarkable.  R. 318.

On January 8, 2009, Dr. Debra Phillips, M.D., ordered an ANA
Evaluation Screen test.[3]  The results were abnormal.  R. 314, 317.
The interpretive note from Dr. Rex W. Schulz, M.D., stated:

> Speckled ..... This titer is of probable clinical significance.
> It may be drug induced but is less likely to be related to
> malignancy or advancing age.  This pattern is most
> frequently seen in scleroderma, mixed connective tissue
> disease, systemic lupus erythematosus, rheumatoid
> arthritis, and discoid lupus.  Anti-DNA and anti-ENA
> may be useful if clinically indicated.

R. 317.

On March 9, 2009, Fryrear underwent a pulmonary function
test for possible asthma.  The test results were normal.  R. 319.

On January 31, 2010, Fryrear saw Dr. Paula Mackrides, D.O.,
at Blessing Hospital in Quincy, Illinois, complaining of right-side
numbness.  R. 342-46.  The numbness started in her face and, over
two days, went to the right arm, leg, and torso with weakness.  R.
342.  Dr. Mackrides noted that Fryrear saw Dr. Ann Miller for
suspected lupus which "has not been confirmed even though an
extensive workup has been performed in the past."  R. 342.  On
examination, strength was 5/5 in all extremities and sensation was

---

[3] The records from Blessing Hospital in Quincy, Illinois, indicate that Dr.
Phillips holds an M.D. degree.  R. 346.

intact. R. 343. A CT scan of the brain was normal. R. 345. Dr. Mackrides ordered an MRI of Fryrear's brain and recommended TED hose and ambulating for leg pain. Dr. Mackrides also noted that Fryrear's Raynaud's was stable and recommended continuing home medications for narcolepsy. R. 344. Dr. Mackrides did not define what she meant by "home medications," but she reviewed Blessing Hospital's automated records of Fryrear's medications. R. 342. Blessing Hospital emergency room records from September 30, 2008, indicated that Fryrear was prescribed Adderall to be taken twice a day. R. 340.

On February 3, 2010, Fryrear underwent an MRI of her brain. The MRI showed a Chiari I malformation. R. 295. A Chiari malformation occurs when part of the cerebellum is located below the opening that connects the brain to the spinal cord. See National Institute of Neurological Disorders and Stroke, Chiari Malformation Fact Sheet, located at www.ninds.nih.gov/disorders/chiari/, viewed February 22, 2016.

On February 26, 2010, Dr. White ordered an ANA Evaluation Screen test. The test was positive at 1:80/titer. R. 296.

On August 26, 2010, a state agency physician Dr. Virgilio Pilapil, M.D., opined that Fryrear's physical impairments were non-severe through June 30, 2005, her date last insured for DIB.  R. 436.  Dr. Pilapil opined that Fryrear suffered from pregnancy and carpal tunnel syndrome prior to June 30, 2005.  He opined that these conditions were non-severe at the time because Fryrear completed the pregnancy by December 15, 2005, and as of June 30, 2005, surgery was planned to address the carpal tunnel upon completion of the pregnancy.  R. 438.

On August 27, 2010, a state agency psychologist Dr. Joseph Mehr, Ph.D., prepared a Psychiatric Review Technique form.  R. 439-51.  Dr. Mehr opined that Fryrear's medical records contained insufficient evidence of any mental impairment through Fryrear's date last insured for DIB, June 30, 2005.  R. 439.

On September 13, 2010, Fryrear underwent a Chiari decompression with fascia lata graft surgery.  R. 466-72.  Dr. Arden Reynolds., M.D., performed the surgery.  Dr. Reynolds examined Fryrear that day before performing surgery.  Her mental status examination was normal.  R. 462-63.  Fryrear was discharged from the hospital on September 16, 2010.

R. 466-72.

On October 27, 2010, Fryrear saw Dr. Reynolds' certified nurse practitioner, Anita L. Arnold, CNP, for a follow-up examination on the Chiari malformation repair surgery.  Fryrear reported that she was getting along very well.  Fryrear reported intermittent headaches that were well-controlled with pain medication.  The headaches were "more frequent with changes in the weather from hot to cold."  R. 478.

On November 2, 2010, a state agency psychiatrist Dr. Young-Ja Kim, M.D., reviewed Dr. Mehr's Psychiatric Review Technique form on reconsideration, and affirmed his opinion.  R. 489.

On December 8, 2010, Fryrear saw Arnold for a follow-up examination on the Chiari malformation repair surgery.  Fryrear reported intermittent headaches that lasted for a short period of time and usually resolved with Tylenol.  Fryrear reported prickly sensations on the back of her neck in cold weather.  She denied any vision changes or changes in balance.  On examination Arnold noted that Fryrear's gait was steady.  Arnold recommended increasing activities as tolerated and specifically recommended a daily thirty-minute walk.  R. 610.

On January 7, 2011, Fryrear saw state agency psychologist Dr. Frank Froman, Ed.D., for a consultative mental examination. R. 491-94.  Fryrear reported that she had had a stroke and was diagnosed with a Chiari malformation.  Fryrear reported that she had surgery on the malformation and continued to have significant problems thereafter.  She reported chronic pain, excessive fatigue, and inability to use stairs.  She also reported that she had a type of narcolepsy.  She used to fall asleep standing up, but she did so no longer.  She reported, though, that she could fall asleep "at the drop of a hat."  R. 491.

Dr. Froman found that Fryrear was oriented and in good contact with reality.  Dr. Froman opined that Fryrear's IQ was average or better.  He assessed residual dementia with the Chiari malformation, and he gave her a Global Assessment of Functioning (GAF) score of 70.  Dr. Froman opined that Fryrear could perform one or two step assemblies at a competitive rate, could relate adequately with co-workers and supervisors, could understand simple oral and written instructions, and could handle stress of customary employment.  R. 493.

On January 30, 2011, a state agency psychologist Dr. Leslie Fyans, Ph.D., prepared a Psychiatric Review Technique form and a Mental Residual Functional Capacity Assessment form.  R. 495-512.  Dr. Fyans opined that as a result of Fryrear's status post neurosurgery, Fryrear had mild restrictions on daily living activities and in maintaining concentration, persistence or pace; and moderate difficulties in maintaining social functioning.  R. 496, 505.  Dr. Fyans opined that Fryrear had moderate difficulties understanding, remembering, and carrying out detailed instructions.  R. 509.  Dr. Fyans found no other functional limitations from her neurosurgery.  R. 509-10.  Dr. Fyans opined that Fryrear retained the mental capacity to perform substantial gainful activity that involved one and two-step unskilled tasks.  R. 511.

On January 31, 2011, a state agency physician Dr. Sandra Bilinsky, M.D., prepared a Physical Residual Functional Capacity Assessment form.  R. 513-20.  Dr. Bilinsky opined that Fryrear could lift twenty pounds frequently and ten pounds occasionally; could stand and/or walk for six hours in an eight-hour workday; and could sit for six hours in an eight-hour workday.  Dr. Bilinsky

noted that Fryrear was recovering well from her Chiari malformation surgery.  Dr. Bilinsky opined that Fryrear could return to light work activity by September 2011.  R. 514.  Dr. Bilinsky opined that Fryrear was limited to occasional climbing, balancing, stooping, crouching, kneeling, and crawling.  R. 515.  Dr. Bilinsky opined that Fryrear had no other physical limitations.  Dr. Bilinsky concluded:

> The claimant's symptoms and alleged functional limitations have been consistently described throughout the case record.  The examining source's opinions are consistent with the residual functional capacity determined in this decision.  Finally, the report submitted by Dr. White is given appropriate weight in this assessment.

R. 520.

On March 9, 2011, Fryrear saw Arnold for a follow-up examination on the Chiari malformation repair surgery.  Fryrear reported that she was getting sinus headaches that she treated with Tylenol or ibuprofen.  Fryrear reported that the headaches were "getting less and less."  R. 603.  Fryrear reported that she was increasing her daily activity and had "gotten back to her daily rituals."  R. 603.  Fryrear reported that taking care of her special needs child could bring on headaches.  On examination Arnold

found "Excellent upper extremity strengths.  Gait is steady."  R. 603.  Arnold recommended Tylenol as needed for headaches.  R. 603.

On April 5, 2011, Fryrear saw Dr. White.  Dr. White noted that Fryrear was recovering slowly from the "Chiari."  Fryrear reported that her leg was still bothering her and she still had intermittent headaches.  Fryrear reported that she was told by Dr. Reynolds that she would probably need more surgery in the future.  R. 571.

On May 17, 2011, Fryrear saw Dr. White to follow up on the effect of a new medication named Savella that Dr. White prescribed. Fryrear reported that the medication was working, that Fryrear had decreased leg pain and an "overall improved sense of well-being." R. 572.  Fryrear reported having "quite a bit of hip pain" after spending two or three hours on her feet.  Fryrear reported that she was working at Kohl's Wholesale.  Fryrear also reported good results from her current physical therapy.  On examination, Fryrear had full range of motion in both hips "with good hip adductor, abductor flexor and extensor strength."  R. 572.

On August 16, 2011, Fryrear saw Dr. White.  Fryrear reported continuing difficulty with weakness and pain in her legs and pain in

her hands, upper shoulders, and neck.  R. 572.  On examination, Dr. White noted absent pinprick and soft touch sensation elbows to fingers bilaterally, and absent soft touch and diminished pinprick sensation from the knees to the toes bilaterally.  Fryrear's grip strength was 3+/5, her wrist strength was 4+/5, flexion and extension of ankles were 4+/5, and she had a positive Romberg sign.  R. 573.

On August 18, 2011, Dr. White completed a form entitled "Medical Source Statement of Ability to do Work-Related Activities (Physical)."  R. 521-24.  Dr. White opined that Fryrear could lift less than ten pounds occasionally or frequently; stand and/or walk for less than two hours in an eight-hour workday; and would need to alternate between sitting and standing in an eight-hour workday.  R. 521.  Dr. White opined that Fryrear's ability to push and pull was impaired because she had "Neuropathy & loses grip easily."  R. 522.  Dr. White opined that Fryrear's sensation for pinprick and soft touch was absent from elbows to finger tips bilaterally, and her sensation for soft touch was absent and her sensation for pinprick was diminished from her knees to her toes bilaterally.  Dr. White opined that Fryrear's grip strength was 3/5 and her wrist strength

was 4/5.  R. 522.  Dr. White opined that Fryrear could occasionally crawl, but could never balance, kneel, crouch, or stoop.  Dr. White did not note any limitation on Fryrear's ability to climb.  R. 522. Dr. White opined that Fryrear was limited to frequently handling and fingering, but she could feel constantly.  R. 523.  Dr. White opined that Fryrear should avoid temperature extremes, vibration, and hazards such as machinery or heights.  R. 524.  Dr. White noted that Fryrear had neuropathy and Raynaud's phenomenon, and vibration would exacerbate pain.  Dr. White agreed with Fryrear's allegation that her disability began on May 1, 2005.  R. 524.

On September 21, 2011, Fryrear saw Arnold for a one-year follow-up examination after Chiari malformation repair surgery. Fryrear reported that she was doing fairly well.  She completed physical therapy and had full range of motion in her neck.  Fryrear reported constant aching and heaviness sensation in her legs that she treated with compression hose.  Fryrear reported an aching sensation throughout her arms and legs.  Fryrear also reported numbness and tingling in her hands.  On examination, Arnold found, "Coordination is good.  Excellent upper and lower extremity

strength, iliopsoas, quads, EHL, anterior and posterior tibials, deltoids, biceps, triceps, and grips are all intact fully.  No headaches are noted.  The patient's gait is steady."  R. 600.

On December 8, 2011, Fryrear saw Dr. White.  Fryrear reported pain that originated in her left wrist and forearm and radiated into her left arm, shoulder, and neck.  Fryrear reported that her splints provided some improvement, but the pain was getting increasingly worse.  On examination, Phalen's sign and Tinel's sign were positive, Fryrear's grip was weaker on the left, and Fryrear had some muscle wasting/atrophy.  Fryrear had good range of motion in her shoulders, and movement of her shoulders did not cause or exacerbate the pain.  Dr. White diagnosed left carpal tunnel exacerbation.  R. 575.  Dr. White referred Fryrear to Dr. Crickard.  R. 576.

From December 12, 2011 to March 9, 2012, Fryrear underwent physical therapy for pain in her left wrist and in her lower extremities.  She was discharged from therapy because her progress had plateaued.  Her worst pain went from 8/10 down to 6/10.  R. 567.

On May 24, 2012, Fryrear saw Dr. White and complained of left carpal tunnel symptom.  Fryrear also complained of leg pain. Fryrear's leg pain was relieved when put on compression hose.  Dr. White noted decreased grip strength on the left.  Carpal tunnel surgery was already scheduled for June 22, 2012.  R. 577.

On June 14, 2012, Fryrear had a preoperative visit with Dr. Crickard.  Fryrear continued to report tingling and numbness in the left hand.  Dr. Crickard reported that Fryrear had a "positive EMG carpal tunnel."  Dr. Crickard took a history to prepare for surgery. R. 589.

On June 22, 2012, Fryrear underwent left carpal tunnel release surgery.  R. 653.

On July 5, 2012, Fryrear saw Dr. Crickard for a follow-up examination.  Fryrear reported that she was better in both hands. She reported less numbness and tingling and gains in grip strength. R. 583.

On September 20, 2012, the Administrative Law Judge (ALJ) conducted an evidentiary hearing in Hannibal, Missouri.  R. 30-65. Fryrear appeared in person and with her counsel.  Vocational Expert Dr. Jeffrey Magrowski, Ph.D., appeared by telephone.  R. 32;

<u>see</u> R. 141.  Fryrear's attorney confirmed that the file was complete. R. 33.

Fryrear then testified.  She was married and lived in a single family house with her husband and two children, an eight-year-old boy and a six-year-old girl.  Fryrear completed high school and took some college courses, but did not complete any course of study. She last worked in January 2005 as a shipping clerk for a company that manufactured boat anchors.  R. 38.  She had to lift anchors up to twenty pounds as part of the job.  R. 39.  She stopped working when the anchor business closed.  R. 38-39.

Fryrear started to go to college in 2005 after the anchor business closed, but she stopped because she started getting sick. Fryrear testified that she started falling asleep standing up.  Fryrear testified that she started having pain in her upper extremities.  She also had pains in her chest that turned out to be gallstones.  R. 39. She testified that she could not return to school at the time of the hearing because she had difficulty holding a pen or pencil and also had a hard time typing on a computer.  R. 40.

Fryrear testified that her carpal tunnel syndrome started in 2005.  She had pain that caused her to wake up at night.  Initially,

she took Tylenol 3 and underwent physical therapy.  She also wore braces on her wrists and forearms.  R. 40-41.

She also had trouble picking up coins and gripping boat anchors.  She was reprimanded for working too slowly because of the problems with her hands.  She testified that her hands went numb while she was holding anchors.  Fryrear testified that she ruined anchors by dropping them.  R. 41-42.  The business reopened, but she was not asked to return to work while other former employees were rehired.  She believed she was not rehired because of her problem holding on to anchors.  R. 42.

Fryrear testified that she had right carpal tunnel surgery in December 2005.  R. 43.  Fryrear testified that she had gallbladder surgery before she had carpal tunnel surgery.  R. 42.  The carpal tunnel surgery helped.  Fryrear testified that the intense night pain stopped.  Fryrear testified, however, that she never got sensation back in her hands.  She testified that she still had trouble with her right hand picking up items from coins to pots and pans and still drops things.  R. 43.

Fryrear testified that she had left carpal tunnel surgery in June of 2012.  Fryrear testified that the surgery stopped the night pain in her left hand.  R. 44.

Fryrear testified that she had narcolepsy.  She testified that she fell asleep when she was stressed.  She testified that, after having children, she fell asleep standing up.  She testified that she fell when she woke up.  She testified that the first time that she fell asleep standing up and then fell when she woke up was in the spring of 2005.  She was standing in her kitchen when she fell asleep and then fell into the kitchen wall when she woke up.  R. 45. She testified that she also fell asleep in public places such as waiting rooms. R. 44.  She testified that she fell asleep in this manner four to six times per month.  R. 45.

Fryrear testified that she took Adderall twice a day for her narcolepsy.  She testified that the medicine allowed her to keep her driver's license and to maintain a routine.  She testified that she was able to stay awake from when the children came home from school until her husband came home from work.  R. 45.  She also took naps at specific times during the day, 10:00 a.m. and between 1:30 p.m. and 2:00 p.m.  R. 46.  She testified that if she did not

take her naps, she fell asleep at inappropriate times, such as waiting at the bus stop for her children. R. 46. She testified that during an episode, she slept for a period from thirty seconds to three minutes. R. 47. Fryrear testified that the doctor at Quincy Sleep Center in Quincy, Illinois, diagnosed her with narcolepsy. R. 48. She testified that she did not see the doctor who made the diagnosis. The doctor looked at the study results to make the diagnosis. R. 48-49.

Fryrear testified that she liked to draw, but her carpal tunnel kept her from engaging in that hobby. R. 50-51.

Fryrear testified that she had surgery on her Chiari malformation on September 13, 2010. R. 51. Fryrear testified that she was diagnosed when she had spells in which she was unable to breathe. She was told she had a stroke. The Chiari malformation was detected on an MRI examination. R. 51.

Fryrear testified that the surgery went fine and she was told that the symptoms would improve over the next year. She testified that her symptoms did not improve. She testified that she had pain and heaviness in her legs every day, like her legs were bruised. R. 52. She testified that she wore compression hose to alleviate the

pain.  She testified that she could only wear them during the day.
R. 53.  Fryrear also testified that she had continued pain and lack
of sensitivity in her shoulders and biceps.  The pain was similar to
her carpal tunnel symptoms, but not so intense.  R. 53-54.  She
testified that she stiffened up and had a hard time getting out of
bed or out of a chair.  She also testified that she had pain with any
pressure on her body.  She testified that she experienced severe
pain if her child sat on her.  R. 54.  Fryrear testified that Dr. White
prescribed the hose.  R. 55.

Fryrear testified that she wore ankle braces because she had
overly flexible ankle joints.  R. 54.

Fryrear testified that she underwent physical therapy for her
carpal tunnel syndrome and for the pain in her legs.  R. 56.

Fryrear testified that in a typical day she got out of bed in the
morning, took her pain medication and put on her compression
hose.  She waited thirty minutes for the pain medication to "kick
in."  R. 56.  She got her kids ready for school.  She would sit down
until 1:30 p.m. or 2:00 p.m. and then start to get a chore done or
dinner started.  She did her chores, and she picked the kids up as
the bus stop at about 3:00 p.m.  She supervised her kids while they

3083-SEM-TSH # 18 Page 24 of 40

did their homework.  She served dinner at 6:00 p.m.  Her husband came home about 6:30 p.m.  Her children did their homework and took baths.  Her children were in bed by 8:30 p.m.  She then went to bed.  R. 56-57.

The ALJ asked Fryrear if she could work a job in which she could sit most of the day.  Fryrear said she could if she could get up and move at will.  R. 57.

Fryrear testified that she had difficulty keeping up with her children.  Her son was severely autistic and often tried to get away from her.  She put a harness and leash on him to keep him from getting away.  R. 57.  He also still wore a diaper.  R. 56.

Vocational expert Dr. Magrowski then testified.  Dr. Magrowski stated that he would like to hear Fryrear's testimony about her other past work.  R. 58. The ALJ asked Fryrear about her past work.  Fryrear testified that she worked as a direct support person for elderly and disabled persons who were in "staff-assisted independent living."  R. 59.  She worked that job full-time for eighteen months.  She was not required to lift to perform this job.  She worked overnight and cleaned the house, did laundry, and got the individuals ready in the mornings.  R. 59-60.  The ALJ

confirmed that Dr. Magrowski had enough information about

Fryrear's two jobs.  R. 60.

The ALJ asked Dr. Magrowski the following hypothetical

question:

> I want you to assume an individual with the claimants'
> age, education, and work history who is limited to the full
> range of light exertional work as defined in the
> regulations; limited to occasional climbing of ramps and
> stairs and ladders and ropes and scaffolds; occasional
> balancing, stooping, kneeling, crouching, and crawling.
> Such an individual is limited to bilateral frequent
> handling and fingering and bilateral constant kneeling
> (sic) [feeling].  Such an individual must avoid all exposure
> to extreme cold and all exposure to excessive vibrations.
> Such an individual must avoid all exposure to hazards,
> such as operational control of moving machinery and
> unprotected heights. . . .  Could such an individual
> return to any of the past work . . . ?

R. 61.  Dr. Magrowski testified that such a person could perform

Fryrear's past work as a shipping clerk as it exists in the national

economy.  R. 61.  Dr. Magrowski testified that such a person could

also perform other jobs in the national economy, such as office

helper, with 1,500 such jobs in Missouri and 80,000 in the national

economy; sales clerk, with 1,000 such jobs in Missouri and over

150,000 in the national economy; assembler of laundry, with 1,000

such jobs in Missouri and 20,000 nationally; and mail clerk with

2,500 such jobs in Missouri.  R. 61-62.

## II. THE DECISION OF THE ALJ

On December 14, 2012, the ALJ issued his decision.  R. 12-

24.  The ALJ followed the five-step analysis set forth in Social

Security Administration Regulations (Analysis).  20 C.F.R.

§§ 404.1520, 416.920.  Step 1 requires that the claimant not be

currently engaged in substantial gainful activity.  20 C.F.R.

§§ 404.1520(b), 416.920(b).  If true, Step 2 requires the claimant to

have a severe impairment.  20 C.F.R. §§ 404.1520(c), 416.920(c).  If

true, Step 3 requires a determination of whether the claimant is so

severely impaired that she is disabled regardless of her age,

education and work experience.  20 C.F.R. §§ 404.1520(d),

416.920(d).  To meet this requirement at Step 3, the claimant's

condition must meet or be equal to the criteria of one of the

impairments specified in 20 C.F.R. Part 404 Subpart P, Appendix 1

(Listing).  20 C.F.R. §§ 404.1520(d), 416.920(d).  If the claimant is

not so severely impaired, the ALJ proceeds to Step 4 of the Analysis.

Step 4 requires the claimant not to be able to return to her

prior work considering her age, education, work experience, and

Residual Functional Capacity (RFC).  20 C.F.R. §§ 404.1520(e) and

(f), 416.920(e) and (f).  If the claimant cannot return to her prior

work, then Step 5 requires a determination of whether the claimant

is disabled considering her RFC, age, education, and past work

experience.  20 C.F.R. §§ 404.1520(g), 404.1560(c), 416.920(g),

416.960(c).  The claimant has the burden of presenting evidence

and proving the issues on the first four steps.  The Commissioner

has the burden on the last step; the Commissioner must show that,

considering the listed factors, the claimant can perform some type

of gainful employment that exists in the national economy.  20

C.F.R. §§ 404.1512, 404.1560(c); Weatherbee v. Astrue, 649 F.3d

565, 569 (7th Cir. 2011); Briscoe ex rel. Taylor v. Barnhart, 425 F.3d

345, 352 (7th Cir. 2005).

　　The ALJ also considered the different relevant time frames for

determining eligibility for DIB benefits and SSI benefits.  To be

eligible for DIB benefits, the claimant must be disabled prior to the

date that she was last insured.  The date last insured depends on

the claimant's work history.  See 42 U.S.C. § 423(c)(1);  20 C.F.R.

404.131.  Fryrear's date last insured was June 30, 2005.  R. 12.  A

claimant may be entitled to SSI benefits regardless of work history

or dates of insurance; however, she may only be eligible to receive benefits commencing on the date she applied for SSI benefits. 20 C.F.R. § 416.335. Fryrear applied for SSI benefits on June 29, 2010. R. 12.

The ALJ found that Fryrear met her burden at Steps 1 and 2. Fryrear had not engaged in substantial gainful activity since May 1, 2005, and she had the severe impairments of status post Chiari I malformation; residual dementia; history of Raynaud's disease; and bilateral carpal tunnel syndrome. R. 14. With respect to Fryrear's other conditions, the ALJ stated:

> I find that all impairments other than those enumerated above, alleged and found in the record, are non-severe or not medically determinable as they have been responsive to treatment, cause no more than minimal vocationally relevant limitations, have not lasted or are not expected to last at a "severe" level for a continuous period of 12 months, are not expected to result in death, or have not been properly diagnosed by an acceptable medical source.

R. 14-15 (citations omitted).

At Step 3, the ALJ found that none of Fryrear's impairments or combination of impairments met or medically equaled the severity of a Listing. R. 15.

At Step 4, the ALJ found that Fryrear had the following RFC:

> After careful consideration of the entire record, I find the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) except occasional climbing of ramps, stairs, ladders, ropes, and scaffolds; occasional balancing, stooping, kneeling, crouching, and crawling; frequent bilateral fingering and handling; constant feeling; avoid all exposure to extreme cold and excessive vibrations; avoid all exposure to hazards such as moving machinery and unprotected heights; and limited to simple, routine, repetitive tasks.

R. 16.  In explaining the RFC finding, the ALJ summarized Fryrear's testimony regarding her impairments.  The ALJ mentioned Fryrear's claims of neuropathy from the Chiari malformation.  The ALJ recited the history of Fryrear's carpal tunnel syndrome and her testimony about her continued loss of sensation and her inability to pick up and hold objects.  R. 17.

The ALJ reviewed evidence regarding Fryrear's allegations of narcolepsy:

> According to the claimant, she has narcolepsy, which causes her to fall asleep unexpectedly about 4-6 times a month in episodes lasting from 30 seconds to 3 minutes. She described having episodes while standing up, while waiting for her children to get off the school bus and during waits for medical treatment.  The claimant admitted that a doctor diagnosed narcolepsy after review of her medical chart, and she never actually saw the doctor who diagnosed the condition.  Stress exacerbates the condition.  However, the claimant admitted that Adderall is prescribed and it provides relief, as does daily

> napping while her children are in school.  The claimant
> said she has sustained falls due to narcolepsy.

R. 17-18.

The ALJ then found that Fryrear's testimony about the

"intensity, persistence and limiting effects" of her condition was not

credible.  The ALJ found that her testimony was not consistent with

the medical record.  The ALJ first looked at the period from

Fryrear's alleged onset date of May 1, 2005, until her last day

insured for DIB, June 30, 2005.  The ALJ noted that "good physical

exam results were reported and no objective imaging reports

supported disability."  R. 18.  The ALJ stated that Fryrear made

subjective reports of pain and numbness from carpal tunnel

syndrome which improved with physical therapy.  The ALJ also

noted that several objective tests were normal:

> Several objective imaging studies were completed well
> after the date last insured and prior to the application
> date for Title XVI benefits.  They revealed normal results.
> For example, a 2007 sleep study revealed results not
> compatible with narcolepsy.  A chest x-ray and
> pulmonary function test in 2009 revealed normal results.

R. 18.  The ALJ noted that in January 2010, "Narcolepsy was

treated with home medications and Raynaud's disease was stable . .

. ."  R. 18.

The ALJ noted that Fryrear's condition improved after the Chiari malformation repair surgery.  The ALJ referenced nurse practitioner Arnold's follow-up examinations that showed continued improvement over the next year.  R. 19. The ALJ also referenced Fryrear's report to Dr. White in 2011 that she was working at a wholesale facility and was on her feet for two to three hours before experiencing pain.  The ALJ stated, "Her activities belied severe limitation because the claimant reported she was employed at a wholesale facility and she underwent monthly physical therapy treatments."  R. 19.

The ALJ also noted that Fryrear's carpal tunnel syndrome was improved after surgery.  The ALJ cited treatment notes that recorded less numbness and tingling and improved grip strength. R. 19.  The ALJ concluded that Fryrear's testimony about the severity of her symptoms was not consistent with this medical evidence.

The ALJ also relied on the opinions of the consultative psychologist, Dr. Froman, the state agency psychologists Drs.  Mehr and Fyans, and the state agency psychiatrist Dr. Kim regarding Fryrear's mental limitations.  R. 20-21.  The ALJ gave little weight

to the opinions of state agency physicians Drs. Bilinsky and Pilapil regarding Fryrear's physical limitations.  The ALJ stated these doctors opined that Fryrear could perform the full range of light work, but the ALJ found that Fryrear's ability to work was more limited.  R. 21.

The ALJ gave great weight to Dr. White's opinions about Fryrear's limitations on fingering, handling, and feeling.  The ALJ found that these were supported by the record after Fryrear's last carpal tunnel surgery.  The ALJ gave little weight to Dr. White's opinions of Fryrear's ability to lift, carry, sit, stand, walk, and assume postures such as kneeling, crouching, or crawling.  The ALJ found that these opinions were not supported by the medical record.  R. 21.

At Step 4, the ALJ found that Fryrear could not perform her past relevant work.  The ALJ relied on the Department of Labor Dictionary of Occupational Titles (DOT) and the testimony of Dr. Magrowski.  R. 22.

At Step 5, the ALJ found that Fryrear could perform a significant number of jobs in the national economy.  The ALJ relied on the Medical-Vocational Guidelines, 20 C.F.R. Part 404, Subpart

P, Appendix 2, and the opinions of Dr. Magrowski that Fryrear

could perform the jobs of office helper, mail clerk, and assembler.

R. 22-23.  The ALJ concluded that Fryrear was not disabled.

Fryrear appealed the decision of the ALJ.  Fryrear submitted

additional evidence to the Appeals Council.  <u>Commissioner's</u>

<u>Memorandum in Support of Motion for Summary Judgment (d/e</u>

<u>16)</u>, attached <u>Supplemental Certified Record of Proceedings before</u>

<u>the Social Security Administration dated December 21, 2012</u>

<u>through January 8, 2013</u>.   The supplemental evidence included

records from two office visits to Dr. White.

On December 27, 2012, Fryrear saw Dr. White.  Dr. White

noted, in part:

> S:  She is here kind of at the very tail-end of an
> exacerbation or flare of whatever rheumatologic condition
> or autoimmune condition she has.  We have not ever
> been able to fully  diagnose it.  She has intermittent
> positive tests. . . .

R. 672.  Fryrear reported sinus congestion, fatigue, body aches, and

stiffness in her fingers.  R. 672.  On examination, Fryrear's fingers

and wrists were swollen and tender with decreased range of motion.

Dr. White assessed "exacerbation of rheumatologic/autoimmune

disorder NOS."

R. 672.  Dr. White prescribed Prednisone.

On January 8, 2013, Fryrear saw Dr. White.  Dr. White noted in part:

> S:  Terrie is here for followup . . . .  She has recovered from her exacerbation of whatever it is she has with the Prednisone but continues to have ongoing fatigue, myalgias and arthralgias.  Is having increasing fine motor difficulty with her hands which makes it difficulty (sic) for her to do things.  Gets frustrated because she is trying to get Disability which I actually think is very appropriate for her to be getting given her underlying autoimmune rheumatologic issue.

R. 676.  Dr. White ordered another ANA test and additional testing.

R. 676.  The results are not in the record.

On January 23, 2014, the Appeals Council denied Fryrear's request for review.  The decision of the ALJ then became the final decision of the Defendant Commissioner of Social Security.  R. 1.  Fryrear then brought this action for judicial review.

### III. ANALYSIS

This Court reviews the Decision of the Commissioner to determine whether it is supported by substantial evidence.  Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate" to support the decision.  Richardson v. Perales, 402 U.S. 389, 401 (1971).  This Court must

accept the findings if they are supported by substantial evidence and may not substitute its judgment.  Delgado v. Bowen, 782 F.2d 79, 82 (7th Cir. 1986).  This Court will not review the credibility determinations of the ALJ unless the determinations lack any explanation or support in the record.  Elder v. Astrue, 529 F.3d 408, 413-14 (7th Cir. 2008).  The ALJ must articulate at least minimally his analysis of all relevant evidence.  Herron v. Shalala, 19 F.3d 329, 333 (7th Cir. 1994).  The ALJ must "build an accurate and logical bridge from the evidence to his conclusion."  Clifford v. Apfel, 227 F.3d 863, 872 (7th Cir. 2000).

In this case, the ALJ failed to build a logical bridge from the evidence to his conclusion about Fryrear's sleeping disorder.  The ALJ misread the results of the 2007 sleep latency test.  The test report stated that the results were "compatible with a tendency for hypersomnolence/hypersomnia and is not incompatible with narcolepsy."  R. 306.  The ALJ erroneously stated that the test results "were not compatible with narcolepsy."  R. 18.

This erroneous reading of the 2007 test results could have affected both the ALJ's findings at Step 2 and his credibility determination.  The ALJ found that the sleeping disorder was non-

severe at Step 2.  The ALJ stated that the conditions he found to be
non-severe were not medically determinable or were not diagnosed
by an acceptable medical source.

R. 14-15.  The ALJ should address whether this finding should
change in light of the error in his reading of the sleep latency test
results.

 The ALJ also misquoted the sleep latency test results in his
discussion of the medical evidence that supported his credibility
finding.  The error could have affected the credibility finding.  The
credibility finding necessarily affected the rest of the opinion,
including the RFC finding, the evaluation of the opinion evidence,
and the findings at Steps 4 and 5.  All of these portions of the
opinion, therefore, may need to be revised on remand.

 The Court also does not understand the ALJ's apparent
criticism that Fryrear did not meet the doctor who diagnosed her
sleeping disorder.  <u>See</u> R. 17-18.  Fryrear's testimony indicates that
she believed that the doctor who interpreted the sleep latency test
results diagnosed her condition.  <u>See</u> R. 47-49.  It is unclear to the
Court why it matters whether she met the doctor who interpreted
the results.  Patients often do not meet specialists such as

radiologists and other physicians who interpret complex test results.

The ALJ also failed to address all the material evidence regarding Fryrear's carpal tunnel syndrome.  The ALJ stated that Fryrear's claims of carpal tunnel injuries from her alleged onset date, May 1, 2005, to her last date insured, June 30, 2005, were based on her subjective reports.  R. 18.  The ALJ further stated that during this time period, "no objective imaging reports supported disability."  R. 18.  The ALJ nowhere mentions that on April 19, 2005, Dr. Crickard noted that nerve conduction and EMG studies showed that Fryrear had "bilateral moderately severe median neuropathies with compression at the carpal tunnels."  R. 286.  Dr. Crickard's examination note was made twelve days before May 1, 2005, but still is clearly relevant and shows that objective testing supported Fryrear's reports of impairment from carpal tunnel syndrome symptoms.

The ALJ must articulate at least minimally his analysis of all relevant evidence.  <u>Herron</u>, 19 F.3d at 333.  The ALJ failed to mention Dr. Crickard's examination note and gave the erroneous impression that no objective testing supported Fryrear's subjective

3:14-cv-03083-SEM-TSH   # 18   Page 38 of 40

reports of pain and numbness prior to her date last insured. On remand, the ALJ should correct this error and revise this portion of his decision.

Fryrear also challenges the ALJ's treatment of Dr. White's opinion and the RFC determination. The ALJ specifically relied on his credibility determination in making the RFC finding. The ALJ necessarily must reconsider his RFC finding as part of his review of his credibility determination.

The ALJ gave little weight to Dr. White's exertional and postural findings because they were inconsistent with other evidence in the record. R. 21. The ALJ was required to give controlling weight to Dr. White's opinion, as a treating physician, on the nature and severity of impairments if the opinion "is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence" in the record. 20 C.F.R. § 404.1527(c)(2). The Court agrees with the ALJ that Dr. White's exertional opinions were inconsistent with Arnold's examination notes and with Fryrear's report that she worked at a Kohl's Wholesale store in which she stood for two to three hours. On remand, however, the

Page **38** of **40**

ALJ should still review this finding in light of any revisions to his credibility findings.  A change in the credibility finding, if any, could affect the weight given to Dr. White's opinions.

The Court does not address the request for a remand under sentence six 42 U.S.C. § 405(g) because the matter should be reversed and remanded on the other grounds noted above.  On remand, the ALJ can consider additional evidence, including the supplemental evidence in which Dr. White assessed a non-specific autoimmune/rheumatologic disorder.[4]  The evidence was not before the ALJ at the time he made the first decision, and so, was not relevant in reviewing that decision.  See Wolfe v. Shalala, 997 F.2d 321, 322 n.3 (7th Cir. 1993).

## IV. CONCLUSION

For the reasons stated, Plaintiff Fryrear's Brief in Support of Motion for Summary Judgment (d/e 10) is GRANTED and Defendant Commissioner of Social Security's Motion for Summary Affirmance (d/e 15) is DENIED.  The decision of the Commissioner

---

[4] Counsel for Fryrear reported to the ALJ that the record was complete (R. 33), but significant gaps exist in the medical record, including the nerve conduction EMG studies, the 2006 carpal tunnel surgery records, the examination notes from Dr. Miller regarding possible Lupus, and several years of Dr. White's treatment notes.  On remand, counsel may want to consider whether to provide some of this material if available.

is REVERSED and REMANDED for further proceedings under

sentence four of 42 U.S.C. § 405(g).  CASE CLOSED.

**ENTER:  February 22, 2016**

**FOR THE COURT:**

    <u>      s/Sue E. Myerscough</u>
    **SUE E. MYERSCOUGH**
   **UNITED STATES DISTRICT JUDGE**